**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

ELK RIVER PIPELINE LLC,

                Plaintiff,

v.                                    CIVIL ACTION NO.  2:10-cv-01080

EQUITABLE GATHERING LLC, et al.

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending are Defendant EQT Gathering LLC's ("EQT")[1] motion for summary judgment [Docket 48] and motion for summary judgment on its counterclaim [Docket 50].  Plaintiff, Elk River Pipeline LLC, ("Elk River") responded to EQT's motion for summary judgment and EQT filed its Reply.  Elk River filed no response to EQT's motion for summary judgment on its counterclaim.  For the reasons that follow, the Court **DENIES** EQT's motion for summary judgment [Docket 48] and **DEFERS** ruling on EQT's motion for summary judgment on its counter-claim [Docket 50].

---

[1]  The caption of this case identifies Defendant as "Equitable Gathering LLC."  This appears to be a name formerly used by EQT.  EQT maintains in its pleadings that its proper name is "EQT Gathering, LLC".  Thus, the Court **DIRECTS** the Clerk to change the case caption to reflect Defendant's correct name, "EQT Gathering, LLC".

I.      BACKGROUND

A.  *Factual Background*

EQT is a natural gas company based in Pittsburgh, Pennsylvania.  EQT maintains an office in Charleston, West Virginia.   In the spring and early summer of 2008, EQT invited qualified contractors to bid on a natural gas pipeline project located in Logan County, West Virginia.  (Docket 52-1 at 7.)  The project was known as the "Grant Node project" and involved construction of a gas pipeline connected by eight separate nodes. (Dockets 48-4 at 3 and 52-1 at 5.)  The pipeline was intended to enhance EQT's gas gathering capability in the natural gas fields underlying the Grant Node project site.  (Docket 52-1 at 2.)

Prior to soliciting bids for the project, EQT determined the construction routes and directed its engineers to map the Grant Node pipeline routes.  (Docket 50-1 at 3.)  (Docket 52-1 at 6.)  Equipped with GPS devices and topographical maps, EQT's engineers walked the project terrain and mapped the routes.  (*Id*.)  EQT then reviewed the maps, compiled them into a "project package," and provided the package to prospective qualified pipeline construction contractor bidders at a pre-bid meeting.  (*Id.* at 7.)  Only contractors who had previously signed a Master Construction Services Agreement ("MCSA") with EQT, however, were permitted to attend the pre-bid conference and submit bids on the project.  (Docket 52-1 at 8.)

The senior project manager on the Grant Node project was Dennis George.  (Docket 48-4 at 3.)  Mr. George oversaw the project from EQT's Charleston office and occasionally visited the project site.  (*Id.*)  At the time the Grant Node project was being planned, there was a shortage of qualified contractors. (Docket 48-4 at 4.)  Mr. George contacted Terry Gandee, an experienced pipeline construction worker with whom Mr. George previously worked back in 2005. (Docket 52-3 at 2-3.)  George had a high opinion of Gandee's work and, according to Gandee, George

2

needed his help on the project. (Docket 48-4 at 2-4.)   George also felt somewhat indebted to Gandee because Gandee taught him "a lot about pipeline" when the men worked together on the 2005 job.  (*Id.*)   When George telephoned Gandee, he advised Gandee about the Grant Node project and recommended that Gandee form a company.[2] (Docket 52-3 at 25.)   Thereafter, according to Gandee, George helped him formed "Elk River Pipeline LLC", the Plaintiff in this case. (Docket 52-3 at 4.) Mr. George testified that he assisted Mr. Gandee in obtaining a MCSA with EQT.  (Docket 48-4 at 2.)  George's assistance to Gandee was substantial and, according to George, included "filling out the request forms and everything for [Gandee's] master service agreement and then shaking the bush in Pittsburgh until it finally fell out."  (*Id.* at 19.)

1. *The Master Construction Services Agreement*

On June 13, 2008, Mr. Gandee, on behalf of Plaintiff Elk River, and EQT signed their MCSA.  (Docket 48-2 at 1-22.)  The MCSA is a 22-page form contract prepared by EQT that anticipates and is dependent upon EQT's future acceptance of a possible bid by Elk River for unspecified work. (*Id.*)  The MCSA provides that in the event that EQT accepts a bid for work from Elk River, the agreed scope of the work will be set forth in a purchase order.  (*Id.* at 1.)

EQT admits that the MCSAs are "boilerplate standard documents" that all EQT contractors are required to sign.  (Docket 52-5 at 2)  In the words of Mr. George, it is a "take it or leave it" contract.  (Docket 52-1.)  According to Elk River's Complaint, the MCSA was signed at EQT's Charleston, West Virginia office (Docket 1-1 at 8), although EQT in its Answer to the Complaint asserts that it is without sufficient information to form a belief as to the truth of this statement (Docket 3).

---

[2]  The Court presumes that EQT preferred or required its contractors to be incorporated.

The MCSA defines various terms used throughout the agreement.  For example, the term "Purchase Order" is defined as follows:

> The term "Purchase Order" means the order(s) of purchase issued by the Company to the Contractor and identifying the Project, project number, project location, scope of work, and any applicable specifications, drawings, Company requirements, completion date, fixed price, guaranteed maximum price or unit prices and any other terms specific to a Project to be performed under the Contract Document.

(Docket 48-2 at 6.)

The MCSA's definition of "Work" is:

> The term "Work" means the construction and services required of the Contractor by the Purchase Order, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations.  It contemplates the complete installation of the Work as may be reasonably inferred from specifications, drawings, or other Company requirements referenced in the Purchase Order and other Contract Documents.

(*Id.*)

"Project" is defined as "the total construction at the location where the Work is to be performed under the Purchase Order and which may include work by Company or by separate contractors."  (*Id.*)

Article Two of the MCSA is titled "Contract Documents."   (*Id.*)  The first section of this article provides:

> **Scope.** The Parties acknowledge that from time to time, Company may request that Contractor perform work and services on one or more of its projects.  The Company and Contractor agree that, in the event, [comma in original] Company desires to engage Contractor to perform work and services in connection with one or more such projects and desires to accept Contractor's bid or price quotation for the scope of work, Company shall issue a Purchase Order containing a scope of work to be performed at any identified Project.  Company and Contractor agree that, with respect to every Project awarded to Contractor, all Work performed by

4

Contractor shall be in accordance with and governed by the Purchase Order issued by the Company to Contractor to which this Agreement is incorporated, these General Articles of Agreement for Construction Projects, and all specifications, drawing, schedules, riders, exhibits, supplements, amendments, addenda, standards and other conditions referenced therein.   ANY SUCH PURCHASE ORDER(S) ISSUED BY THE COMPANY SHALL BE DEEMED ACCEPTED BY CONTRACTOR ACCORDING TO ITS TERMS UPON THE DATE OF ISSUANCE (UNLESS CONTRACTOR NOTIFIES COMPANY TO THE CONTRARY IN WRITING WITHIN (3) BUSINESS DAYS OF RECEIPT) OR, IF EARLIER, UPON CONTRACTOR'S ACKNOWLEDGMENT, COMMITMENT OR BEGINNING OF PERFORMANCE.

(*Id.*)

The MCSA also provides that the Company, in its discretion, may makes changes in the agreed "Work."  (*Id.* at 8.)  Article Four of the MCSA provides, among other things, that

Changes in the Work may be accomplished without invalidating the Contract Documents by Change Order issued by the Company at any time.  No changes are to be made, however, except upon a written Change Order issued from the Company to Contractor, and the Company shall not be held liable to Contractor for any extra labor, materials, or equipment furnished in the absence thereof, or for any extra work necessitated by any action or omission of Contractor or a third party.

(*Id.*)  In the event that EQT and Elk River were to disagree with the method of determining the price for the changed work, the MCSA provides that EQT will calculate any adjustment "on the basis of reasonable expenditures and savings relating to the change, including a reasonable allowance for overhead and profit" based on six stated criteria. (*Id.*)  Importantly, when a change in the "Work" has occurred, the MCSA does not require Elk River to request in writing or otherwise a change order.

2.  *Elk River's Bid for Grant Nodes 1 & 2*

After the parties signed the MCSA, Mr. George gave Mr. Gandee the same bid package that he had been previously provided to other contractors at the pre-bid conference.  Gandee reviewed the bid package and inspected the project site with an EQT engineer.  The portion of the project between Grant Nodes 1 & 2 included approximately 10,000 feet (or approximately a two or two-and-a-half mile route) that was a relatively easy stretch of terrain to lay pipeline. (Docket 52-1 at 15.)  Mr. George referred to this section as "the Carrot" because it was "a particularly easy" part of the job.  (Docket 48-4 at 6.)  George testified that he told Gandee that a portion of the project might require 16" pipe rather than 12" pipe and that he should make allowances for this when formulating his bid.  (Docket 48-4 at 8.)  According to Gandee, when he inspected the project site, one of EQT's representatives told him that work on Nodes 1 & 2 would start with the so-called Carrot section.  (Docket 48-8 at 5.)  Based on the routes reflected on EQT's maps and his on-site conversations with EQT engineers, Gandee tendered a bid by Elk River for Nodes 1 & 2 of the project.  (Docket 48-4 at 4.)  The Purchase Order reflects that Gandee bid $54 per foot for buried 12" pipe and $42 per foot for 12" pipe constructed on the surface.  (Docket 48-7 at 1.)

In support of its summary judgment motion, EQT tendered to the Court two documents pertaining to Mr. Gandee's bid.  The first is the following one-page document which appears to contain two emails between EQT and Elk River:

**From:** MWoerner@eqt.com
**Sent:** Friday, June 27, 2008 8:07 AM
**To:** elkriverpipeline@verizon.net
**Cc:** dgeorge@eqt.com
**Subject:** RE: Grant 12" Quote
**Attachments:** Elk River Revised.xls

Terry,

Please review the following revisions for the Grant Node 1 & 2 12" projects.
I will need you to please confirm you agree with these revisions and forward back to me the agreed upon.
If you have any questions please feel free to contact me!!!
Have a great day

**From:** terry gandee [mailto:elkriverpipeline@verizon.net]
**Sent:** Wednesday, June 18, 2008 9:25 AM
**To:** Woerner, Michelle
**Subject:** Re: Grant 12" Quote

*MWoerner@eqt.com* wrote:

Good Afternoon Mr. Gandee,

Please see attached bid document for the Grant 12" Nodes. If you would please complete and submit as soon as possible I would greatly appreciate your assistance. If you have any issues please contact Dennis George at 304.348.3866

Also please note: Acceptance of your bid and award of any project is contingent upon final approval as a Equitable approved contractor.

Regards,

Michelle Woerner
Strategic Sourcing Manager
Equitable Production Company
1710 Pennsylvania Avenue
Charleston, WV 25302
Office: 304.348.5320
Cell:   304.543.9314

EXHIBIT
5

(Docket 48-5 at 2.)

7

The second "bid" document offered by EQT in support of its motion is the following spreadsheet:

| Grant Nodes 1 & 2 | | Elk River |
|---|---|---|
| Footage Rate to Install 12" Pipeline (buried) | 3900 | $54.00 |
| Footage Rate to Install 12" Pipeline (surface) | 22500 | $42.00 |
| Fabricate & Install 12" L-Drip w/ 20" Barrel | | $8,000.00 |
| Install Pre-Fabricated 12" L-Drip w/20" Barrel | | $4,000.00 |
| Install 50 Barrel Tank w/Dike | | $10,000.00 |
| Chipped or Shot Rock (per linear foot of line Installed) | | $50.00 |
| Open Cut Road Crossing (w/o conduit) | | $105.00 |
| Open Cut Stream Crossing (w/o conduit) | | $105.00 |
| Open Cut Road Crossing (w/ conduit) | | $125.00 |
| Conventional Road Bore Crossing (w/ conduit) | | $300.00 |
| Directional Road Bore (w/ Powercrete) | | $480.00 |
| Install 2" Side Tap (w/ valve set) & tie-ins applicable to the tap | | $1,200.00 |
| Install 3" Side Tap (w/ valve set) & tie-ins applicable to the tap | | $1,600.00 |
| Install 4" Side Tap (w/ valve set) & tie-ins applicable to the tap | | $2,000.00 |
| Install 6" Side Tap (w/ valve set) & tie-ins applicable to the tap | | $2,600.00 |
| Install 8" Side Tap (w/ valve set) & tie-ins applicable to the tap | | $3,400.00 |
| Install 12" Side Tap (w/ valve set) & tie-ins applicable to the tap | | $4,200.00 |
| Install 12" Main Line Valves (w/ risers) | | $4,800.00 |
| Install 12" Main Line Valves (w/o risers) | | $3,000.00 |
| Install 12" Meter Tubes | | |
| Install 12" Pig Launcher | | |
| Install 12" Pig Receiver | | |
| Anodes | | $80.00 |
| Anode Bed | | |
| Work Days to Complete | | 25 |

(Docket 48-5 at 2.)  (The Court notes that in the original exhibit, the middle column containing the numbers "3900" and "22500" is highlighted in yellow.  Unaided by the parties' briefing, the Court is unable to discern with any certainty whether these figures represent the total footage of the project or some other thing.  Based upon Dennis George's deposition, it appears that the total

footage of the Grant Nodes 1 & 2 project was the sum of these two figures, that is, 26,400.  *See* Docket 52-1 at 12.)

By letter dated June 27, 2008, EQT accepted Mr. Gandee's bid.  (Docket 48-6.)   The letter is signed by Ms. Woerner, EQT's Strategic Sourcing Manager.  (*Id.*)  In this letter, EQT states, among other things, that the "[w]ork shall commence only upon formal notification by Dennis George, Sr[.] Project Manager.  The work on the project shall be governed by the Master Services Agreement that you signed with Equitable and any supplemental instruments, regulation, construction standards, or other applicable document." (*Id.*)  The letter directs Mr. Gandee to contact Ms. Woerner if Mr. Gandee had any questions.  (*Id.*)  Mr. George is copied on the letter. (*Id.* at 2.)

Mr. Gandee obtained financing for the equipment, materials, and labor he would need to fulfill his obligations under the MCSA.  (Docket 48-8 at 3.)  After he received a line of credit from Huntington National Bank and other funding from a private investor, Mr. Gandee then rented various bulldozers, backhoes, and other heavy equipment needed for the project and purchased materials.  (*Id.*)  He also obtained office space in Charleston because, according to Mr. Gandee, that was one of EQT's requirements.  (*Id.* at 4.)

### 3.  *EQT's August 28, 2008 Purchase Order*

Elk River began its work for EQT sometime in August 2008, although the exact date is unclear.  Although Elk River's invoices reflect that its work began in early August (Docket 48-3 at 1), EQT's initial Purchase Order for Elk River's work is dated August 28, 2008.  (Docket 48-7 at 1.)  The Purchase Order indicates that the "Work" was requested by "William D. George," presumably Dennis George.  (*Id.*)  The Purchase Order identifies Mr. George as the "project manager" and states that "Grant Node 1 & 2 – 12" Pipeline Project" is the project. (*Id.*)

Purchase number 88491 is assigned, Elk River is the vendor, and the number of work days needed to complete is "25". (*Id.*)  The Purchase Order further states "This OC 88492 is in agreement with the Master Construction Services Agreement between Elk River Pipeline and Equitable Gathering, LLC, dated 06-13-2008." (*Id.*)  What follows is a series of line items that corresponds almost exactly with the spreadsheet that EQT represents is Mr. Gandee's bid. (*See* Docket 48-5.)  One notable difference, however, is that unlike the spreadsheet that is attached to the parties June 2008 emails with the figures "3900" and "22500," no such figures appear anywhere on the Purchase Order.  Rather, under the heading "Scope of Work," the Purchase Order states "PERFORM PIPELINE CONSTRUCTION SERVICES AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF EQUTIABLE GATHERING LLC. FOR THE GRANT NODE 1 & 2 – 12" PIPELINE PROJECT, UNLESS PURCHASE ORDER [IS] OTHERWISE TERMINATED BY EQUITABLE GATHERING LLC." (Docket 48-7 at 2.)

> 4. *The Parties' Dispute*

The parties' dispute concerns the parties' understanding of the scope of the "Work" Elk River contracted to perform under the MCSA and the Purchase Order.  On the first day of the project, Mr. Gandee moved his equipment and workers to the section called the Carrot. (Docket 48-4 at 5.)  The parties do not appear to dispute that before any work began, EQT representatives instructed Gandee to start work on a different section of the Grant Nodes 1 & 2 project and that Gandee complied. (*Id.*)  Gandee testified in his deposition that he immediately complained to Dennis George about how EQT had taken away the easy part of his construction job. (Docket 48-4 at 6.)  Gandee told George that this part of the job was "critical" to the formulation of his bid on the project because his bid took into account expenses associated with both the easy and the more difficult sections of the pipeline route. (*Id.*)  Gandee told George that he wanted to be

10

compensated for this action by EQT.  (*Id.* at 6.)   George, however, refused to issue a change

order, but assured Gandee that "we will get it straightened out."[3]  (Docket 48-8 at 6.)  Thereafter,

Gandee began work where George instructed him to start.  (*Id.* at 6, 8.)  Gandee did not discuss

the problem with anyone at EQT other than George because that was who was in charge of the

project. (*Id* at 6.)

      Mr. George admits that EQT took away the Carrot section from Mr. Gandee at the

beginning of the job, that EQT should have issued a change order and should have revised Elk

River's purchase order to reflect the change in Elk River's project scope, and that he "probably

would have" increased the overall dollar rate per foot of Elk River's bid to compensate Elk River

for EQT's change in the scope of work if Gandee had "fussed about it enough." (Docket 48-4 at

6.)  According to George, however, Elk River never requested a change order and Gandee did

not do any "serious complaining" until a later point in the project.  (*Id.*)

      Under the Purchase Order, Elk River's work was supposed to be completed in 25 days.

(Docket 48-7 at 1.)  It appears that there were several delays in the construction project and Elk

River continued to perform construction work on Grant Nodes 1 & 2 until May 2009.   Elk

River's work consisted of pipeline construction on Nodes 1 & 2 (aside from the Carrot), as well

as some additional work caused by re-routing pipeline routes and other matters.  (Docket 48-8 at

12.)   Elk River submitted thirty-four invoices and was paid by EQT on all but the last of these

invoices.  This last invoice, Invoice #34, reflects a half dozen disputed items tallying up to

$1,546,712.50.  (Docket 48-3.)  These various expenses reflect Elk River's belief that it was

entitled to an $18 overall footage price increase to its original footage bid because of EQT's

---

[3]  The Court understands that Mr. George is no longer employed by EQT and that EQT may
dispute some of his testimony at trial.

11

alleged changes in the original scope of the project and because other expenses resulting from delays caused by EQT in the project. (*Id.*) Mr. George admits that he assisted Mr. Gandee in his preparation of this invoice. (Docket 48-4 at 8, 10.) Mr. George, however, testified that his assistance was only intended to help Mr. Gandee with his grammar and wording and did not necessarily mean that he "agreed or disagreed with" the amounts Gandee claimed in the invoice. (Docket 52-1 at 18.)

### B. Procedural Background

On August 3, 2010, Elk River filed suit against EQT in the Circuit Court of Kanawha County, West Virginia. (Docket 1-1 at 7-9.) The Complaint alleges two counts for breach of contract and a third count alleging a claim of unjust enrichment. (*Id.*) EQT was served on August 5, 2010. (*Id.* at 1.) On September 7, 2010, EQT removed the case to federal court.[4] EQT filed a counterclaim based on Elk River's alleged improper invoicing of EQT for "at least $294,000." (Docket 3 at 6.)

EQT filed it motion for summary judgment contending that Pennsylvania, rather than West Virginia, law governs the construction of the MCSA. (Docket 49 at 4-5.) EQT also contends that it should be awarded summary judgment because EQT and Elk River's agreement is fully covered by the MCSA and EQT has not breached its obligations under that agreement. (*Id.* at 1.) EQT argues that Elk River's problems are the consequence of its failure to seek a change order for any change in the work "as required by the terms of the Master Construction Services Agreement." (*Id.*) EQT further argues that Elk River was "never guaranteed an amount

---

[4]   The Court need not explore whether EQT's removal was timely under 28 U.S.C. § 1446(b). Elk River did not object to the timeliness of EQT's removal of this case and violations of § 1446(b)'s thirty-day rule are waivable procedural defects that do not affect the Court's subject matter jurisdiction. *Caperton v. A.T. Massey Coal Co.*, 251 B.R. 322, 324 (S.D. W. Va. Aug. 1, 2000) (Haden, J.) (citing cases).

of footage to construct."  (Docket 53 at 1.)  EQT attacks each item of damages alleged by Elk River in its final invoice.

In response, Elk River contends that West Virginia law governs this dispute.  (Docket 52 at 4-6.)  Elk River also argues that EQT breached the MCSA by taking away the Carrot section of the project and by changing the pipeline bore width from 12" to 16" for certain other sections of the project.  (*Id.* at 6-11.)  Elk River also contends that the MCSA is an unconscionable adhesion contract and is, thus, unenforceable as a matter of law. (*Id.* at 8-11.)  Alternatively, Elk River contends that its Invoice 34 should be construed as a change order under the MCSA because it is undisputed that Dennis George assisted Elk River in preparing that document.  (*Id.* at 11-14.)  Finally, Elk River contends that it is entitled to damages caused by EQT's delays because the delays were allegedly caused by EQT's failure to obtain necessary permits and right-of-ways needed for the construction.  (*Id.* at 14-15.)  Elk River admits that it has not been able to prove with specificity the dates it was not able to work because EQT has failed to provide it with the necessary documentation.  (*Id.*)

Defendant also filed a motion for summary judgment on its counter-claim.  (Docket 50.) That motion seeks recovery for "at least $294,000" that EQT paid Elk River based on "multiple invalid and inaccurate invoices" submitted by Elk River.  (*Id.* at 2.)   Elk River filed no response to this motion.[5]

---

[5]  In its Invoice 34, Elk River offsets its bill by $318,840.  The invoice states that the offset is a credit for "overbilling on total footage" and a "[c]redit for previous billing on directional [d]rill at buried rate."  (Docket 48-3 at 2.)   This may explain Elk River's failure to defend EQT's motion for summary judgment on its counter-claim.

*II. LEGAL STANDARD*

Summary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.  56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If factual issues exist that properly can be resolved only by a trier of fact because they may reasonably be resolved in favor of either party, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *see also Pulliam Inv. Co., Inc. v. Cameo Props*., 810 F.2d 1282, 1286 (4th Cir. 1987).  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  *Overstreet v. Ky. Cent. Life Ins. Co*., 950 F.2d 931, 937 (4th Cir. 1991).  A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  *See* Fed. R. Civ. P.  56(e).  A court must neither resolve disputed facts nor weigh the evidence.  *Russell v. Microdyne Corp*., 65 F.3d 1229, 1239 (4th Cir. 1995).  Nor may a court make determinations of credibility. *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The moving party bears the initial burden of showing that there is no genuine issue of material fact, and that he is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322–23.

14

"The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." *Temkin v. Frederick Cty Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991). When determining whether there is an issue for trial, the Court must view all evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc*., 915 F.2d 121, 123 (4th Cir. 1990). The non-moving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56, advisory committee notes, 1963 Amendment, Subdivision (e). In order to properly assess "proof" the party resisting a summary judgment motion must support his factual assertions by: 1) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or 2) showing that the materials cited establish the presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support proffered facts. See Fed. R. Civ. P. 56(c)(1)(A-B). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may, *inter alia*, consider any unsupported or unaddressed facts undisputed and grant summary

judgment if the summary judgment motion, its supporting materials, and the undisputed facts show the movant is entitled to relief. *See* Fed. R. Civ. P.  56(e).

## III.   DISCUSSION

### A.  West Virginia Law Governs the Construction of the MCSA and Purchase Order

EQT contends that, because the MCSA is a valid and binding contract, the choice of law provision in the MCSA should control which law governs resolution of this motion.  The MCSA choice of law provision requires that the MCSA be "construed, interpreted and enforced in accordance with and shall be governed by the laws of the Commonwealth of Pennsylvania, excluding its conflict of law rules."  *See* Docket 48-2 at 19.   Elk River, however, contends that because the MCSA is invalid, its choice of law provision has no bearing on this analysis.  Elk River also argues that West Virginia law should govern because Pennsylvania has no substantial relationship to the MCSA because the entirety of the work performed was done in West Virginia, the Plaintiff is a West Virginia resident, and EQT, although based in Pittsburgh, maintained an office in Charleston, West Virginia.

The Court agrees with Elk River that West Virginia law governs construction of the MCSA and Purchase Order.  Pursuant to *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), the applicable law in a diversity case such as this is determined by the substantive law of the state in which a district court sits.  This includes the forum state's prevailing choice of law rules. *See Klaxon Co. v. Stentor Electric Mfg. Co*., 313 U.S. 487, 496–97 (1941).  Under West Virginia law, "[a] choice of law provision in a contract will not be given effect when the contract bears no substantial relationship with the jurisdiction whose laws the parties have chosen to govern the agreement, or when the application of that law would offend the public policy of this state."  Syl. Pt. 1, *Gen. Elec. Co. v. Keyser*, 275 S.E.2d 289, 293 (W. Va. 1981).   "The law of the state in

16

which a contract is made and to be performed governs the construction of a contract when it is involved in litigation in the courts of [West Virginia]."  *Id.*, Syl. Pt. 2.

The Court's analysis of this issue is thwarted by the fact that neither party appears to have any idea where the MCSA was executed.  Elk River alleges in its Complaint that the MCSA was executed in at EQT's Charleston office.  In its Answer to the Complaint filed back in September 2010, EQT claims that it is "without knowledge or information" to know if Elk River's assertion is true or not; EQT does not deny Elk River's assertion.  (Docket 3.)   Two years later, in its motion for summary judgment, EQT offers no further facts to establish where its own contract was executed.   Moreover, contrary to its Complaint, Elk River claims in its response to EQT's summary judgment motion that "[t]he evidence is void of any reference as to where the contract was signed." (Docket 52 at 5.)

This issue arises on EQT's motion and the Court **FINDS** that EQT offers no evidence concerning where its own contract was executed.  It appears that the individual who accepted Mr. Gandee's bid was a West Virginia-based EQT employee, Ms. Woerner.  The entirety of the work that is the subject of the MCSA was performed in Logan County, West Virginia.  The Plaintiff is a West Virginia company that presumably hired at least some (if not many) West Virginia laborers to assist in completing the project.   EQT maintained a West Virginia office out of which written and email correspondence flowed back and forth to Elk River's office in Clendenin, West Virginia.  Elk River issued its invoices to EQT from its Clendenin office.

17

Therefore, the Court further **FINDS** that the MCSA bears no substantial relationship with Pennsylvania.[6]

  B.  *EQT's Motion for Summary Judgment [Docket 48]*

      1.      *West Virginia Contract Law*

"A meeting of the minds of the parties is a *sine qua non* of all contracts." Syl. Pt. 4, *Riner v. Newbraugh*, 563 S.E.2d 802 (2002) (citing Syl. Pt. 1, *Martin v. Ewing*, 164 S.E. 859 (W. Va. 1932) and Syl. Pt. 1, *Wheeling Downs Racing Ass'n v. West Virginia Sportservice, Inc.*, 199 S.E.2d 308 (1973)).   A meeting of the minds "may be shown by direct evidence of an actual agreement or by indirect evidence through facts from which an agreement may be implied." *Ways v. Imation Enters. Corp*, 589 S.E.2d 36, 44 (W. Va. 2003).

The elements of a contract are an offer and an acceptance supported by consideration. *Dan Ryan Builders, Inc. v. Nelson,* No. 12-0592, 2012 WL 5834590 *5 (W. Va. Nov. 15, 2012); Syl. Pt. 1, *First Nat. Bank of Gallipolis v. Marietta Mfg. Co.*, 153 S.E.2d 172, 177 (1967); Syl. Pt. 5, *Virginian Export Coal Co. v. Rowland Land Co.*, 131 S.E. 253 (1926) ("The fundamentals of a legal contract are competent parties, legal subject matter, valuable consideration and mutual assent. There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement.").

"That consideration is an essential element of, and is necessary to the enforceability or validity of a contract is so well established that citation of authority therefor is unnecessary." *First Nat. Bank of Gallipolis*, 153 S.E.2d at 177.  Conversely, a "promise or contract where there

---

[6]     As the following discussion makes apparent, the legal principles that govern the Court's analysis are so rudimentary, well-settled, and universal that application of the laws of Pennsylvania law or West Virginia law will not alter the Court's ultimate conclusions.

is no valuable consideration, and where there is no benefit moving to the promisor or damage or injury to the promisee, is void." Syl. Pt. 2, *Sturm v. Parish*, 1 W. Va. 125 (1865).

"Under West Virginia law, contract interpretation is a question of law and requires a court to determine the meaning and legal effect solely from the document's contents.  Where the contract language is clear and unambiguous, it 'cannot be construed and must be given effect and no interpretation thereof is permissible.'" *Stanley v. Huntington Nat'l Bank*, No. 12-1145, 2012 WL 3570805 *2 (W. Va. Aug. 21, 2012) (Stamp, J.) (quoting *Berkeley Cnty. Pub. Serv. Dist. v. Vitro Corp. of Am.*, 162 S.E.2d 189, 200 (W. Va. 1968); *see also Kanawha Banking & Trust Co. v. Gilbert*, 46 S.E.2d 225, 232–33 (W. Va. 1947).   A contract is ambiguous only if it is "reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning." *Mylan Labs. Inc. v. Am. Motorists Ins. Co*., 700 S.E.2d 518, 524 (W. Va. 2010) (per curiam).

"Consideration" is "some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by another. A benefit to the promisor or a detriment to the promisee is sufficient consideration for a contract." *First Nat. Bank of Gallipolis* 153 S.E.2d at 177 (citations omitted).  In contract formation "[a] valuable consideration may consist either in some right, interest, profit or benefit accruing to the one party or some forbearance, detriment, loss or responsibility given, suffered, or undertaken by the other." Syl. Pt. 1, *Tabler v. Hoult*, 158 S.E. 782 (1931).

"Ordinarily in West Virginia a written contract is considered to merge all of the negotiations and representations made prior to its execution, and extrinsic evidence is not available to alter or interpret language which is otherwise plain and unambiguous on its face." *Iafolla v. Douglas Pocahontas Coal Corp*., 250 S.E.2d 128, 135 (W. Va. 1978).  "Where a

19

writing appears to be a complete contract, embracing all the particulars necessary to make a perfect agreement and designed to express the whole arrangement between the parties, it is conclusively presumed to embrace the entire contract and all the terms and provisions of the agreement." *Wood Cnty. Airport Auth. v. Crown Airways, Inc*., 919 F. Supp. 960, 965 (S.D. W. Va. 1996).   Where, however, a later writing omits essential terms which were stipulated in a preliminary agreement, the contract is only partially integrated.  *City of Wheeling v. Benwood-McMechen Water Co.* 176 S.E. 234, 236 (W. Va. 1934).  In such case, the omitted terms of the prior engagement are not invalidated or superseded by the later agreement.  *Id.* (citing Restatement of the Law of Contracts (First), §§ 229 & 240).

### 2. Analysis

Viewing the record as it stands and drawing all reasonable inferences therein in favor of Elk River, EQT has not presented sufficient evidence to permit the Court to find that there are no genuine issues of material fact and that EQT is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56 (a) & (c).

The essence of EQT's summary judgment motion is that, although it took away the easy part of Elk River's project—the so-called "Carrot"—on the first day Elk River showed up for work, Elk River cannot complain because the MCSA and Purchase Order did not guarantee Elk River any particular amount of footage or any particular specific route.  EQT also faults Elk River because it never "sought in writing, any change order to modify the agreed contractual prices as required by the terms of the [MCSA]."  (Docket 49 at 1.)   And EQT resists each of the six items contained in Elk River's final invoice, Invoice 34, relying principally upon various terms and conditions of the MCSA and the Purchase Order.  (*Id.*)

20

This matter involves a thicket of disputed and material facts.  As noted above, under West Virginia law, contract interpretation, a question of law, requires a court to determine the meaning and legal effect solely from the document's contents. *Stanley*, 2012 WL 3570805 *2. EQT stakes its motion entirely on the MCSA and the Purchase Order.  The Court, however, is not convinced that these documents fairly evidence the entire contract between the parties or, if they do, that the parties' agreement is sufficiently definite to be enforceable.  Alternatively, assuming the agreement is enforceable, factual questions abound concerning whether other documents besides the MCSA and Purchase Order comprise the complete agreement.  Also, there are questions whether EQT may have breached the agreement by, among other things, failing to provide a sufficiently clear definition of the agreed scope of work in its August 28, 2008 Purchase Order and by permitting the work to begin before a Purchase Order was ever issued.  These, and other questions, can only be answered by a hike deep into the factual shrubbery of this case.

At the heart of the parties' dispute is whether the parties had "a meeting of the minds" with respect to the scope of the work that Elk River was to perform.  When the parties signed the MCSA, they essentially agreed to agree to a possible future event, that is, if Elk River submitted a bid for "Work" and if EQT accepted that bid, then the provisions of the MCSA would bind the parties.

The difficulty in ascertaining the parties' understanding lies in ambiguities with the Purchase Order, a document drafted by EQT.  As presented to the Court, the Purchase Order does not clearly state what "Work" it was that Elk River bargained for.  As noted in the foregoing discussion, the MCSA states that a "Purchase Order" includes, among other things, an order of purchase by EQT to Elk River as well as a description of the projection location and

21

applicable specifications and drawings. Under the MCSA, a "Purchase Order" must identify "the scope of work." Such requirements make sense since they tend to lend clarity and precision to exactly what "work" the parties had in mind when they made their agreement.

The record before the Court is less than clear on this matter. The August 28, 2008, Purchase Order—which is expressly incorporated into the MCSA via Article 2.1,—does not, however, identify the exact project location. Moreover, the section of the Purchase Order that purports to define the agreed scope of Elk River's work provides that Elk River will perform pipeline construction services as requested by an authorized EQT representative "for the Grant Node 1 & 2 – 12" pipeline project." This statement is ambiguous because it fails to memorialize the when, where, and how of the agreement. Nor does it reference "any applicable specifications" or "drawings" as required by the definition of "Purchase Order."

The evidence submitted in connection with EQT's motion for summary judgment suggests that EQT provided Mr. Gandee with the topographical maps and specifications for Grant Nodes 1 & 2 so that he could use this information in formulating an intelligent bid. In his deposition, Mr. George testified that he gave Mr. Gandee a "project package" that contained maps that had specified pipeline routes. The evidence also suggests that Mr. Gandee relied on these maps and specifications to formulate his bid. Thus, these materials—none of which have been provided to the Court—appear to be important to the parties' understanding of the scope of the agreed work and are part of the "Contract Documents" under the terms of the MCSA. These materials may be useful to the finder of fact to answer several important questions: Was there ever a valid written agreement on the scope of work to be performed? If so, did one party breach the agreement in a material respect? If so, who? If there is a breach, what is the aggrieved

22

party's remedy?   Was there an enforceable modification? If there is no enforceable written agreement, is there an enforceable oral agreement?   These matters are heavily dependent upon resolution of disputed facts.

Further confounding the Court's analysis are the materials that EQT claims constitute Elk River's "bid."  This is important.  Elk River's bid and EQT's acceptance of the bid was itself a contract which triggered the parties' obligations under the MCSA.  EQT has given the Court two brief emails that appear to be an incomplete accounting of the communications between the parties regarding Elk River's bid.  The only other "bid" document EQT tendered in support of its motion was a cryptic one-page spreadsheet.  *See* Docket 48-5 at 2.  No explanation is offered by EQT as to who prepared this document, whether it was in final form, what the numbers "3900" and "2250" represent on the middle column of the spreadsheet, and why these numbers are missing from the August 28, 2008 Purchase Order issued by EQT.

Indeed, Mr. Gandee testified that he prepared a few drafts of his bid proposal.  (Docket 53-2 at 5.)  In his testimony, Mr. Gandee initially expressed some uncertainty as to whether this spreadsheet was in fact his final bid, but ultimately concluded "I think this is it."  (*Id.*)  If these figures represent Elk River's belief that it was bidding on a 26,400 foot job as routed in the topographical maps provided to Mr. Gandee by EQT prior to submitting Elk River's bid, factual questions arise as to whether there was some modification of the parties' agreement after Elk River submitted its bid or whether EQT's omission of this information from the Purchase Order was accidental or intentional.   Thus, Elk River's written bid for work—whether it is the spreadsheet and emails provided to the Court, or some other documents—and EQT's acceptance of that bid are material evidence of the parties' actual understanding.

23

EQT's punishing invocation of various provisions of the MCSA and Purchase Order—documents that it drafted—appears misguided where there is at least some evidence that EQT may have violated or abused the very contractual terms on which it relies.  For example, EQT states in its motion that "Elk River never secured, nor sought in writing, any change order to modify the agreed upon contractual prices for work performed by Elk River as required by the terms of the [MCSA] executed by the parties."  (Docket 49 at 1.)  Nowhere, however, in the MCSA is there any requirement for Elk River to seek "in writing"—or orally for that matter—a change order.  Rather, Article 4.1.1 of the MCSA provides

> Changes in the Work may be accomplished without invalidating the Contract Documents by Change Order issued by the Company at any time.  *No changes are to be made, however, except upon a written Change Order issued from the Company to Contractor*, and the Company shall not be held liable to Contractor for any extra labor, materials, or equipment furnished in the absence thereof, or for any extra work necessitated by any action or omission of Contractor or a third party.

(Docket 48-2 at 8) (emphasis added).  Nowhere else in the provisions that follow is there any requirement that the contractor to seek a change order in the event that a change in the "Work" has occurred.  To the contrary, this section flatly prohibits any changes to the "Work" unless EQT issued a change order.  There is no evidence in the record to suggest this was done.  EQT has not seriously disputed that on the first day of the job EQT told Elk River that it would not be constructing the 10,000 foot Carrot section of pipeline.  Assuming that the Carrot was in fact within the agreed scope of work—a material and disputed fact—Defendant has tendered no evidence that EQT ever issued a change order reflecting this change, thereby violating its own contractual terms.  Indeed, if the total construction footage of Elk River's "Work" under the MCSA was 26,400 feet—yet another cloudy and disputed fact—then EQT's unilateral

24

withdrawal of this work represented an abrupt cancellation of close to forty percent of Elk River's project.  Moreover, while there is no evidence that Elk River ever sought a change order regarding the Carrot in writing, Mr. Gandee testified in his deposition that he complained to Dennis George early and often about EQT's abrupt and unilateral withdrawal of this work. Based upon Mr. George's deposition testimony, this is yet another area of contested facts. Further, it is unclear to the Court when Elk River commenced its work and when—and if—EQT in fact improperly withdrew the Carrot section of work from Elk River.  If these events occurred in early August 2008, as Elk River's Invoice 34 suggests, then the Purchase Order which governed the "Work" under the MCSA had not yet been issued.  The bottom line is that this area is rife with factual questions about the parties' agreed scope of work, whether a party repudiated or failed to perform material obligations, whether the scope of work was modified by some agreement, among other issues.

## IV. CONCLUSION

Accordingly, the Court **DENIES** EQT's motion for summary judgment [Docket 48] and **DEFERS** ruling on EQT's motion for summary judgment on its counter-claim [Docket 50].

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:    January  15, 2013

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

25